UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACQUELINE E.,<br><br>                                    Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI,<br>Acting Commissioner of Social Security,<br><br>                                    Defendant. | Case No.:  19cv1024-LL<br><br>**ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>**[ECF No. 26]** |

Plaintiff Jacqueline E. brings this action for judicial review of the denial by the Social Security Administration ("the SSA" or "the Commissioner") of her request for a waiver of overpayment. Before the Court are Plaintiff's Motion for Summary Judgment, [ECF No. 26 ("Mot.")], Defendant's Opposition, [ECF No. 27 ("Opp.")], and Plaintiff's Reply, [ECF No. 29]. Plaintiff consents to Magistrate Judge jurisdiction. ECF No. 4. For the below reasons, Plaintiff's Motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.      BACKGROUND

In August 2005, Plaintiff began receiving disability insurance benefits ("SSA benefits") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. See Administrative Record ("AR") at ECF No. 21 at 84. At some point after Plaintiff began working again, the SSA decided that Plaintiff was not entitled to SSA benefits after

November 2012 based on her earnings. AR 89, 263. The SSA generated two notices – one dated September 26, 2012 and the other dated October 1, 2012 – informing Plaintiff of the SSA's decision. Id. In December 2012, however, Plaintiff continued to receive payments, which the SSA acknowledges was a mistake.[1] Opp. at 6.  Additionally, on November 1, 2013, and again on November 7, 2014, the SSA sent Plaintiff notices increasing her disability payments in order to credit her for her earnings in the previous years. Id. at 92-95.

On November 17, 2015, the SSA sent Plaintiff a bill for $78,581. Id. at 97. On November 25, 2015, Plaintiff sent the SSA a letter disputing the charge. Id. at 101. On January 4, 2016, Plaintiff filled out a Request for Waiver of Overpayment Recovery or Change in Repayment Rate form. Id. at 102. Plaintiff checked the box for "[t]he overpayment was not my fault and I cannot afford to pay the money back and/or it is unfair for some other reason." Id.

On January 21, 2016, the SSA sent Plaintiff a notice informing her it could not approve her request for a waiver of overpayment based on the facts it possessed. Id. at 113. The SSA also informed  Plaintiff of her right to have a personal conference with an SSA representative before it decided her waiver request. Id. On February 8, 2016, Plaintiff had

---

[1] The SSA does not explain why the mistake occurred. During the subsequent hearing on the issue, the Administrative Law Judge explained:

> [T]he way the Agency's systems works with this, sometimes even with reporting they, the computer system doesn't pick up the earnings until a later date. You know, that's why a lot of times these overpayments occur. . . . [I]t's lots of times it's not for the IRS records are from my understanding. It's like the computers system doesn't really see it until the IRS records hit it, unless someone flags it. And that's just a vague understanding of how they do it, but I know that, just the whole way it works, this, this occurs. Where there's a lag with earning, even when someone is reporting, there's a lag with the system, you know sending out an alert you know there's an overpayment here.

Id. at 60-61.

19cv1024-LL

a personal conference with an SSA representative. Id. at 118-19.  On February 24, 2016, the SSA sent Plaintiff a letter informing her that her waiver request was denied. Id. at 120.

On April 22, 2016, Plaintiff filed a request for a hearing before an Administrative Law Judge (ALJ). Id. at 10. On February 8, 2018, a hearing was held before ALJ Carol Buck. Id. at 21. Plaintiff appeared pro se.[2] Id. During the hearing, Plaintiff explained she stopped working in February 2016, and her SSA benefits had resumed, but the SSA was withholding payments to cover the $78,581 in overpayments.[3] Id. at 21-22.

On May 29, 2018, the ALJ denied Plaintiff's request for a waiver and ordered that $525 per month be withheld from Plaintiff's current SSA benefits. Id. at 16. On May 31, 2019, Plaintiff filed the instant action for judicial review pro se. ECF No. 1. On June 28, 2019, the Court denied Plaintiff's Motion to Proceed In Forma Pauperis ("IFP") and dismissed Plaintiff's case without prejudice. ECF No. 5. On August 7, 2019, the Court granted in part and denied in part Plaintiff's Motion for Reconsideration of the Court's IFP decision. ECF No. 8. The Court again denied Plaintiff's request for IFP status, but granted Plaintiff's alternative request for an additional ninety days to arrange for the payment of her filing fee. Id. at 3. On November 5, 2019, Plaintiff paid the filing fee and the case was re-opened. ECF No. 9. The Clerk issued a summons on November 6, 2019. ECF No. 10.

On February 27, 2020, the Court ordered Plaintiff to show cause why the action should not be dismissed for failure to serve the SSA. ECF No. 11. On May 27, 2020, Plaintiff filed proof of service. ECF No. 16. On July 27, 2020, the SSA moved ex parte to stay the case because of the COVID-19 pandemic. ECF No. 19. The Court granted the

---

[2] During the hearing, Plaintiff stated she contacted about 20 different attorneys, but was unable to obtain representation, even if she paid out-of-pocket, because "there's no back payment component in this." AR 22-23.

[3] The SSA states that, as of August 13, 2021, a total of $39,481 has been withheld from Plaintiff's second round  benefits to repay the $78,581 overpayment. Opp. at 7 n.3.

motion and ordered the case stayed until the SSA regained capacity to produce the Administrative Record.[4] ECF No. 20.

On June 2, 2021, the SSA filed the Administrative Record. ECF No. 21. On July 28, 2021, Plaintiff filed her Motion for Summary Judgment. ECF No. 26. On August 13, 2021, the SSA filed its Opposition. ECF No. 27. On September 3, 2021, Plaintiff filed her Reply. ECF No. 29.

## II.    <u>STANDARD OF REVIEW</u>

"The district court reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." <u>Hill v. Astrue</u>, 698 F.3d 1153, 1158-59 (9th Cir. 2012). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1162 (9th Cir. 2001). Substantial evidence is "more than a mere scintilla, but may be less than a preponderance." <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006). "[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" <u>Id.</u> (quoting <u>Hammock v. Bowen</u>, 879 F.2d 498, 501 (9th Cir. 1989)). If "the record considered as a whole can reasonably support either affirming or reversing the [the SSA's] decision, the decision must be affirmed." <u>McCartey v. Massanari</u>, 298 F.3d 1072, 1075 (9th Cir. 2002). The court reviews "only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." <u>Garrison v. Colvin</u>, 759 F.3d 995, 1010 (9th Cir. 2014). Additionally, the court may not reverse the ALJ's decision on account of harmless error. <u>Molina v. Astrue</u>, 674 F.3d 1104, 1111 (9th Cir. 2012). The burden of

---

[4] On April 8, 2020, to the COVID-19 pandemic, the Chief Judge of the United States District Court for the Southern District of California stayed all Social Security cases filed on or after March 1, 2020. Order of the Chief Judge No. 21, ¶ 6. The Chief Judge ordered the stay in each case to be lifted automatically upon the filing of an Administrative Record by the SSA. <u>Id.</u> ¶ 10.

proving an error was not harmless falls upon the party attacking the SSA's determination. Id. A reviewing court may enter a judgment affirming, modifying, or reversing the SSA's decision. 42 U.S.C. § 405(g). The reviewing court may also remand the matter to the SSA for further proceedings. Id.

### III.   **DISCUSSION**

The Social Security Act ("the Act") provides that "[w]ith respect to payment to a person of more than the correct amount, the Commissioner of Social Security shall decrease any payment . . . . to which such overpaid person is entitled, or shall require such overpaid person . . . . to refund the amount in excess of the correct amount[.]" 42 U.S.C. § 404(a)(1)(A). The Act also provides, however, that "[i]n any case in which more than the correct amount of payment has been made, there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of [Title II of the Act] or would be against equity and good conscience." Id. § 404(b)(1); see also 20 C.F.R. § 404.506(a) ("Section 204(b) of the Act provides that there shall be no adjustment or recovery in any case where an overpayment under Title II has been made to an individual who is without fault if adjustment or recovery would either defeat the purpose of title II of the Act, or be against equity and good conscience."). In sum, the requirement to repay overpayment is waived if "(1) a claimant is without fault in receiving the payment and (2) requiring repayment would either defeat the purposes of Title II or would be against equity and good conscience." Quinlivan v. Sullivan, 916 F.2d 524, 526 (9th Cir. 1990).

"In determining whether an individual is at fault, the Social Security Administration will consider all pertinent circumstances, including the individual's age and intelligence, and any physical, mental, educational, or linguistic limitations[.]" 20 C.F.R. § 404.507. An overpaid individual is at fault if the facts show that the incorrect payments resulted from:

> (a) An incorrect statement made by the individual which he knew or should have known to be incorrect; or (b) Failure to furnish information which he knew or should have known to be material; or (c) With respect to the overpaid

individual only, acceptance of a payment which he either knew or could have been expected to know was incorrect.

Id. The "fault determination requires a reasonable person to be viewed in the claimant's own circumstances and with whatever mental and physical limitations the claimant might have." Harrison v. Heckler, 746 F.2d 480, 482 (9th Cir. 1984). The fault inquiry is "highly subjective, highly individualized, and highly dependent on the interaction between the intentions and state of mind of the [beneficiary] and the peculiar circumstances of [her] situation." Elliott v. Weinberger, 564 F.2d 1219, 1233 (9th Cir. 1977).[5]

### A.   Plaintiff's Knowledge

The ALJ found Plaintiff was "at fault in causing the overpayment" because the September 26, 2012 and October 1, 2012 notices from the SSA ("the termination notices") "placed [Plaintiff] on notice that her work activity would affect her Title II benefits." AR 13-14. With respect to the September 26, 2021 termination notice, the ALJ found the letter "detail[ed] the rules concerning a trial work period and an extended period of eligibility" and "placed [Plaintiff] on notice that [her] extended period of eligibility began September 2012." Id. at 14. With respect to the October 1, 2012 termination notice, the ALJ found the letter: (1) "told [Plaintiff] she had exhausted her 9-month trial work period;" (2) "warned her that she entered a 36-month extended period of eligibility in which [the SSA] would restart payments for any month that she did not engage in substantial work;" and (3) "told [Plaintiff] specific dollar amounts for earned wages that it would consider to be substantial work." Id. The ALJ concluded:

> Despite these warnings, the claimant continued to work while being paid Title II benefits. In light of the [SSA's] providing of actual and/or constructive notice to the claimant concerning her work activity's consequences upon her eligibility for Title II benefits, the claimant was at fault in causing and/or accepting the overpayment.

---

[5] "[T]he Commissioner bears the burden of proving the fact and amount of overpayment." McCarthy v. Apfel, 221 F.3d 1119, 1124 (9th Cir. 2000). The parties do not dispute the fact or amount of overpayment.

1   Id.

2       Plaintiff argues that in determining Plaintiff was at without fault in accepting the

3   overpayments because Plaintiff knew or should have known her SSA benefits were

4   supposed to stop in December 2012, the ALJ failed to consider all pertinent circumstances,

5   including Plaintiff's: (1) testimony she did not receive or understand the termination

6   notices; (2) credibility; (3) physical and mental limitations; (4) timely submission of

7   employment and earnings reports during the overpayment period; (5) receipt of

8   underpayment notices; and (6) actions and testimony regarding her disability retirement

9   benefits.

10              **1.      Plaintiff's Testimony**

11      Plaintiff does not dispute that if she had received and understood the termination

12   notices she would have known her SSA benefits were supposed to stop in December 2012.[6]

13   Rather, Plaintiff argues it is "clear from the hearing transcript" that she was "not on notice

14   that her benefits were supposed to cease in December 2012 until October 2015." Mot. at

15   10. Plaintiff argues "[t]he ALJ's ruling that Plaintiff had actual or constructive notice of

16   the overpayment as a result of the September 26, 2012 and October 1, 2012 [termination]

17   notices is directly contrary to Plaintiff's testimony that these letters were not received until

18   2018 and 2015 respectively." Id. at 10-11. Plaintiff claims she was "presented with the

19

20

───────────────

21   [6] In the September 26, 2012 notice, titled "Notice of Proposed Decision," the SSA stated

22   that it reviewed Plaintiff's work record from August 2005 to September 2012 to see if she
     was still eligible for disability benefits. Id. 263. The SSA stated: (1) "you may not be

23   eligible for disability payments for: December 2012 and continuing;" (2) "[w]e have not
     decided if you can still get disability payments;" (3) "we may decide to suspend your

24   disability payments; (4) "[i]f we do not hear from you within 10 days, we will make our
     decision about your disability payments we have now;" and (5) "[w]e will send you another

25   letter when we make our decision." Id. at 263-64. In the October 1, 2012 notice, titled

26   "Notice of Revised Decision," the SSA stated "[w]e have decided that your disability has
     ended that that you are not entitled to payments beginning December 2012." Id. at 89. The

27   SSA also stated "[y]ou will be notified later about any overpayment or underpayment due

28   in this case." Id. at 91. The SSA also provided contact information for questions. Id. at 91.

September 26, 2012 letter for the first time at the 2018 hearing," and she only received the October 1, 2012 notice when she called the SSA in 2015 because she had not received her payment. Id.

Prior to and during the 2018 hearing, Plaintiff repeatedly claimed she did not receive the termination notices until 2015 at the earliest. In her January 4, 2016 Request for Waiver of Overpayment, Plaintiff stated, "[w]hen I called SSA in October 2015 due to not receiving my monthly disability payment, the representative told me a notice that my payments were to cease was sent in October 2012. I never received such a notice even though I have always kept SSA informed of my mailing address." Id. at 110. Also, in her Pre-Hearing Statement of Issues and Facts, Plaintiff stated "I learned about the overpayment on October 27, 2015 when I spoke to a Social Security telephone representative because my October 2015 . . . . payment did not arrive as scheduled" and "[t]he only notice I received was a November 17, 2015 bill." Id. at 188. At the hearing, Plaintiff again testified, "the only reason I even found out about the overpayment was my October 2015 payment didn't arrive in my bank account like it usually did."[7] Id. at 43.

Despite these statements, during the hearing, the ALJ made only passing reference to Plaintiff's argument she did not receive or understand the termination notices. The ALJ appears to have simply presumed Plaintiff received the termination notices based on the fact they were in Plaintiff's file. The ALJ also appears to have conflated the issue of whether Plaintiff received and understood the termination notices with the issue of whether Plaintiff was given notice of the amount of overpayment. For example, in response to Plaintiff's testimony that she did not receive notice until 2015, the ALJ stated:

> I can see you did receive notice . . . . it's the notice date . . . . September 26, 2012, and I know you state you don't remember receiving it. . . . [Y]ou need

---

[7] Additionally, as part of her Request for Review of Hearing Decision/Order to the Appeals Council, Plaintiff stated "[t]here was never any evidence as to whether I actually read and understood those letters" and "[t]o be honest, I do not remember the letters and I have wracked my brain over the situation." AR 330.

8

to look through this record, because there's one right here, dated October 1, 2012, we had decided – well you're saying the overpayment it's – we told you your disability has ended and you're not entitled. . . . [W]hat is it that we didn't do that you think . . . . why do you, what's your argument that – what is it exactly that you think you should have received – that's showing you exactly how much it is that you shouldn't be assessed it, because we didn't send the exact amounts earlier or? . . . [T]he fact that we didn't do it in like 2012 doesn't make the . . . . We've given it to you since then and you've had a personal conference. . . .  [W]e advised you in 2012 that you know, and you were told when you were working that you would only be entitled to an extended period of disability and a, a I mean a trial work period and extended period of disability and you're also an attorney.

Id. at 44-47. Plaintiff responded, "I know, I'm an attorney, but I'm an attorney who is not doing well cognitively." Id. at 47.

Other than inquiring about Plaintiff's general mental state during the period of overpayment, the ALJ made no inquiries regarding the pertinent circumstances, at the time the termination notices were issued, regarding Plaintiff's actual or constructive receipt of the termination notices.[8]  For example, the ALJ did not inquire about: (1) other correspondence sent to the same address that Plaintiff admittedly received; (2) Plaintiff's mental state and activities at the time the termination notices were issued; (3) Plaintiff's previous statements regarding correspondence she received from the SSA around that time; or (4) Plaintiff's knowledge at the time with respect to how her work would affect her SSA benefits. The ALJ also did not address Plaintiff's testimony in the ALJ's written decision.

For three reasons, the SSA argues Plaintiff's claims of non-receipt are "dubious." Opp. at 9-10. First, the SSA points out that as part of her April 22, 2016 request for a hearing before an ALJ, Plaintiff stated:

In what I believe was a response to my July 2012 report regarding full-time employment, in August or September 2012, I received two letters from Social

---

[8] The ALJ also did not discuss any applicable standards or procedures under SSA regulations for providing notice to beneficiaries that their benefits would cease.

9

19cv1024-LL

1
2
3

Security discussing my benefits. I sent three letters in response to the correspondence from Social Security. In the letters, I discussed the possible expiration of my benefits. My initial letter was based on Social Security's information in its initial correspondence.

4
5
6
7
8
9
10

AR 143. Plaintiff did not, however, describe the information contained in the letters from the SSA, and Plaintiff's response letters in which she purportedly "discussed the possible expiration of [her] benefits" are not included in the record. Also, the notice confirming the termination of her benefits was issued in October 2012, not August or September 2012. Regardless, in her written decision, the ALJ did not address Plaintiff's statements regarding the two letters she received in August or September 2012. Therefore, it cannot be presumed the ALJ rejected Plaintiff's testimony based on these statements.

11
12
13
14
15
16

Second, the SSA points out that the termination notices were sent to the same address as multiple other notices that Plaintiff acknowledges she received. Opp at 9-10. The SSA argues, "Plaintiff has been unable to explain why the only notices which she did not receive . . . . were the notices of cessation of her benefits." Id. at 9. During the hearing, however, the ALJ never asked Plaintiff to explain why the termination notices were the only notices she allegedly did not receive, and the ALJ does not address the issue in her written decision.

17
18
19
20
21
22
23
24
25
26

Third, the SSA cites Puckett v. Colvin, 599 F. App'x 709, 710 (9th Cir. 2015), in which the Ninth Circuit found an ALJ was not required to verify that a claimant received actual notice of a hearing. The Puckett case is not persuasive, however, because it did not involve notices related to the termination of benefits. The claimant in Puckett appealed the dismissal of his claim on due process grounds after he failed to appear at the hearing before the ALJ. Id. at 709. Additionally, in Puckett, there were specific regulations at issue that addressed requirements for providing notice of a hearing. Id. at 710 (citing, inter alia, 20 C.F.R. §§ 404.938(a), (c), 416.1438(a), (c)). The claimant in Puckett also did not allege a lack of actual notice. Id. As noted above, the ALJ here did not address any SSA regulations or procedures related to notice requirements.

27
28

Based on the record, the ALJ did not consider all pertinent circumstances surrounding Plaintiff's alleged non-receipt of the termination notices. This is legal error,

1    and without further development of the record, the termination notices do not constitute

2    substantial evidence that Plaintiff had actual or constructive notice she was not entitled to

3    SSA benefits beginning in December 2012.[9] Remand is appropriate as to this issue.

4                    **2.    Plaintiff's Credibility**

5            Plaintiff further argues the ALJ failed to properly discredit her testimony that she

6    did not received notice until 2015 at the earliest. Mot. at 10-11. Based on the above, the

7    ALJ rejected, in cursory fashion, Plaintiff's testimony that she did not receive the

8    termination notices. In <u>Lewin v. Schweiker</u>, 654 F.2d 631, 633 (9th Cir. 1981), cited by

9    Plaintiff, the ALJ found an overpaid beneficiary diagnosed with schizophrenia, who

10   testified that her mental condition was poor when she started receiving overpayments, was

11   at fault for accepting the overpayments because: (1) the overpayments were large; (2) the

12   claimant did not immediately report the overpayments; (3) she was uncooperative in

13   resolving the matter; and (4) at the hearing, the claimant was fully oriented. The Ninth

14   Circuit remanded the case "[b]ecause the ALJ's decision neither expressly discred[ed] [the

15   beneficiary's] testimony nor articulate[d] any reasons for questioning her credibility, and

16   fail[ed] to indicate the amount of weight given to various items of evidence[.]" <u>Id.</u> at 635.

17   The Ninth Circuit stated, "courts have consistently required that there be an explicit finding

18   whether the [SSA] believed or disbelieved the claimant whenever the claimant's credibility

19   is a critical factor in the [SSA's] decision." <u>Id.</u>; <u>see also</u> <u>Redfern v. Berryhill</u>, Case No. 18-

20   cv-00016-LB, 2017 WL 818856, at *5 (N.D. Cal. Mar. 2, 2017) (interpreting <u>Lewin</u> to hold

21

22

23

_____

24   [9] Additionally, in her written decision, the ALJ did not explicitly find the notices actually
     informed Plaintiff she was not supposed to receive any SSA beginning in December 2012.
25   Rather, the ALJ found (1) the September 26, 2012 notice informed Plaintiff that her
     "extended period of eligibility began September 2012," and (2) the October 1, 2012 notice
26   informed Plaintiff of the specific wage amounts the SSA would consider to be substantial
27   work, and that the SSA would restart payment payments for any month that she did not
     engage in substantial work. AR 14.
28

that "[a]n ALJ's rejection of a claimant's testimony must be accompanied by a specific finding to that effect, supported by a 'specific, cogent reason for the disbelief'").

The SSA does not dispute the ALJ failed to expressly discredit Plaintiff's testimony, or that the ALJ failed to articulate a reason for questioning Plaintiff's credibility, with respect to Plaintiff's argument she did not receive or understand the termination notices. Instead, the SSA argues that <u>Lewin</u> is distinguishable because "unbeknownst to the average beneficiary, that case involved the period of time when the agency was transitioning from a program administered by individual States into Title XVI Supplemental Security Income; accordingly, 'a common occurrence' at the time was agency error in benefit notices." Opp. at 10. It is not clear, however, why the shift in administration or frequency of overpayments at the time would distinguish <u>Lewin</u>. Both <u>Lewin</u> and the instant case have similar facts as applied to the interpretation of the "without fault" standard for waiver of repayment. <u>See</u> 654 F.2d at 632 n.1. The SSA also argues that <u>Lewin</u> is distinguishable because it "turned" on the credibility of the claimant, whereas here the termination notices "were only part of the ALJ's fault analysis." Opp. at 10-11. As the SSA concedes, however, the test is not whether Plaintiff's credibility was part of the fault analysis, but whether it was a "critical factor." <u>See</u> <u>id.</u> at 10.

Here, Plaintiff's presumed receipt of the termination notices, and the rejection of Plaintiff's testimony that she did not receive or understand them, were critical factors, if not the core factors, in the ALJ's decision that Plaintiff was not without fault. Other than summarily finding that Plaintiff received the termination notices, the ALJ states no other reason for finding Plaintiff knew or should have known she was not entitled to benefits beginning in December 2012. In her written decision the ALJ did not, for example, find that Plaintiff was aware, prior to the termination notices, of the specific consequences of her employment on her SSA benefits. <u>See</u>, <u>e.g.</u>, AR at 15 ("[T]he evidence suggests she had the capacity to appreciate the consequences of her work activity *after being noticed of the consequences.*") (emphasis added). The ALJ also points to no evidence that Plaintiff knew or should have known she was being overpaid during the overpayment period. To

the contrary, the record shows (1) in November 2013 and 2014 Plaintiff received notices informing her she had been underpaid, and (2) she did not receive any notice of overpayment until November 17, 2015 when the SSA sent Plaintiff a bill for $78,581. Id. at 15, 97. While the SSA now argues that because Plaintiff is an attorney she should have known that her employment would adversely affect her SSA benefits, [see Opp. at 11], in her written decision, the ALJ did not cite Plaintiff's legal background as a reason for finding that Plaintiff received actual or constructive notice. Accordingly, Lewin is not distinguishable from the instant case, and Lewin provides further support for remanding the case for development of the record as to the credibility of Plaintiff's testimony that she did not receive or understand the termination notices.

### 3.    Plaintiff's Physical and Mental Limitations

Plaintiff also argues she did not know or have reason to know she was being overpaid because, between August 2012 and October 2015, she was experiencing "cognitive decline and cycling through manic and depressive episodes." Mot. at 11. As noted above, during the hearing the ALJ stated, "I can see you did receive notice" and "we advised you in 2012 that . . . . when you were working that you would only be entitled to an extended period of disability and a, a I mean a trial work period and extended period of disability and you're also an attorney." AR 44, 47. Plaintiff responded, "I know, I'm an attorney, but I'm an attorney who is not doing well cognitively[.]" Id. at 47.

Plaintiff went on to testify that in January 2013 she had a seizure, and in a separate incident in 2013, broke her ankle. Id. at 47-48. Plaintiff also testified that "while [she] was working" she started having manic depressive episodes and did not realize it until "it got really bad . . . . around 2014." Id. at 37-38. She stated, "I don't even know how to explain it other than to say I just did like really absolutely crazy stuff." Id. at 38. She explained that during a manic episode that occurred "previous" to 2014, she "went around and was buying houses in different places [she] had never lived . . . . and then flew back to where [she] lived and decided that house isn't going to work so [she] flew someplace else [and] bought a totally different house." Id. at 39.

In her written decision, the ALJ noted "the claimant stated that she began to decline cognitively in January 2013 due to a seizure, a broken ankle, two surgeries, a serious car accident, two partial outpatient hospitalizations, one in-patient hospitalization, and cycling of manic and depressive episodes." Id. at 14. The ALJ acknowledged Plaintiff "may have had rather serious alleged physical and mental issues when the overpayment accrued." Id. The ALJ nonetheless discounted Plaintiff's physical and mental limitations because: (1) Plaintiff "maintained the physical and mental wherewithal to maintain her employment at the University of San Diego with a work schedule demanding up to 40 hours per week, which involved rather substantial work activities such as counseling students;" (2) "[w]hile the claimant stated that she was not as 'quick' as she used to be while working and she could not keep up with the work, she was capable of maintaining her employment from July 2012 through February 2016;" (3) Plaintiff "diligently and accurately submitted evidence concerning her earnings, which suggests that she understood or could have understood the consequences of her work activity in her extended period of eligibility that the [SSA] clearly spelled out in the October 1, 2012 notice;" and (4) "the claimant drafted rather detailed legal arguments in her briefs[.]" Id. at 14-15.

The ALJ did not, however, address Plaintiff's physical or mental limitations in the context of Plaintiff's argument she did not receive or understand the termination notices. Rather, as noted above, the ALJ found the evidence regarding Plaintiff's physical and mental limitations "suggests that she had the capacity to appreciate the consequences of her work activity *after being noticed of the consequences*." Id. at 15 (emphasis added). Accordingly, remand is also appropriate as to this issue.

### 4.    Employment and Earnings Reports

In support of her argument that she did not know or have reason to know she was being overpaid, Plaintiff also points out that she submitted at least two employment and

///

///

///

earnings reports to the SSA during the overpayment period.[10] Mot. at 11. The ALJ rejected this argument because, under 20 C.F.R. § 404.507, the SSA's fault in overpaying does not relieve Plaintiff's fault. AR 15. However, in rejecting this argument, the ALJ simply presumed, again, that Plaintiff received the termination notices. See id. ("[T]he claimant's acceptance of the overpayment when she was placed on notice that her work activity could affect her eligibility for Title II benefits per [the termination notices] constitutes fault on her part."). The ALJ did not address the undisputed fact that Plaintiff continued to submit accurate employment and earnings reports in the context of Plaintiff's argument that she did not know have reason to know that she was not eligible for SSA benefits during the overpayment period. Accordingly, remand is also appropriate as to this issue.

### 5.    The Underpayment Notices

Plaintiff also relies on the undisputed fact she received two notices from the SSA informing her that she was underpaid. Mot. at 11. The SSA does not dispute that on November 1, 2013, it issued a Notice of Change in Benefits in which the SSA stated: (1) "[w]e checked our records to see if any changes in your benefits are necessary;" (2) "[w]e increased your benefit amount to give you credit for your 2012 earnings;" and (3) "[w]e did not include these earnings when we figured your benefit amount." Id. at 92. The SSA also does not dispute that on November 7, 2014, it issued a second Notice of Change in Benefits informing Plaintiff of the same for her 2013 earnings. Id. at 94.

Here, the ALJ did not explain why the underpayment notices do not support Plaintiff's argument she was not at fault under 20 C.F.R. § 404.507(c), which defines fault as acceptance of a payment the beneficiary "knew or could have been expected to know was incorrect." Rather, the ALJ only addressed the underpayment notices with respect to

_____

[10] In July 2012, Plaintiff began working for the University of San Diego (USD) Law School advising students in the LL.M. program about their class schedules. AR at 188. In August 2012, Plaintiff filled out a "Work Activity Report" for the SSA in which she reported her employment activity and earnings in 2012, which included work not only at USD, but as a document review attorney. Id. at 296, 303.

Plaintiff's alternative argument, discussed below, that she was not at fault under 20 C.F.R. § 404.510a, which provides that a beneficiary is not at fault for overpayment "because of reliance on erroneous information from an official source within the [SSA]." Accordingly, remand is also appropriate as to this issue.

### 6.    Plaintiff's Other Disability Benefits

Lastly, Plaintiff argues her actions with respect to her disability retirement benefits under the Federal Employees Retirement System ("FERS benefits"), and her testimony regarding how she understood her FERS benefits worked, support her argument she did not know or have reason to know her SSA benefits were supposed to stop in December 2012. Mot. at 11. Plaintiff explains that in 2005 or 2006 she applied for FERS benefits based on her previous employment with the Securities and Exchange Commission (SEC). Id. at 5. After retaining an attorney to assist with the FERS benefits application, "Plaintiff was advised that, as part of the FERS disability retirement application, she had to apply for Social Security benefits." Id. Plaintiff testified, "I didn't even think I was gonna get Social Security[.]" Id. AR 37. Plaintiff was awarded both benefits, but her FERS benefits were reduced by 60% of her SSA benefits, including during the three-year overpayment period. Mot. at 12-13. Plaintiff therefore argues she is entitled to 60% of the $78,581 overpayment, which equals $39,481, because had she not been overpaid by the SSA, her FERS benefits would not have been reduced by 60% of her SSA benefits. See id. at 13 ("Plaintiff is not requesting a refund of the monies (the remaining 40%) that were truly overpaid."). Plaintiff testified that had she known she was being overpaid by the SSA, she could have contacted the FERS benefits administrator to stop the deductions. AR 37. Plaintiff therefore argues her lack of knowledge about the termination of her SSA benefits in December 2012 is demonstrated by the fact that: (1) the terms of her FERS benefits allowed her to earn up to 80% of her former salary at the SEC; (2) after the SSA issued the termination notices, the deduction to her FERS benefits continued, and she viewed the benefits as somehow tied;

and (3) she never made a request to her FERS benefits administrator to stop reducing her FERS benefits.[11] Id. at 11.

Here, the ALJ did not address whether Plaintiff's argument regarding her FERS benefits supported Plaintiff's argument she did not know or have reason to know her SSA benefits were supposed to stop in December 2012. Instead, the ALJ found Plaintiff's argument regarding her FERS benefits was irrelevant in deciding whether Plaintiff was overpaid by the SSA. See id. at 13. As noted above, however, Plaintiff does not dispute that she was overpaid or the amount of overpayment. Rather, she argues (1) her actions and understanding regarding her FERS benefits show she did not know her SSA benefits were supposed to stop in December 2012, and (2) as a matter of equity and good conscience, she should not be required to repay the 60% that was deducted from her FERS benefits because, had there been no mistake, there would have been no deduction. Mot. at 11-13. The SSA argues Plaintiff's FERS benefit argument is irrelevant because without a preliminary finding of no fault, the ALJ does not reach the issue of equity and good conscience, and because "[t]he agency cannot forgive an overpayment – even in part – solely because another federal agency has failed to make Plaintiff whole." Opp. at 14. While the SSA may not be able to account for the actions of FERS, the SSA does not address the ALJ's failure to account for Plaintiff's argument and testimony regarding her FERS benefits in the ALJ's fault analysis.  Accordingly, remand is also appropriate as to this issue.

## B.  Erroneous Information

Under 20 C.F.R. § 404.510a, "[w]here an individual . . . . accepts [an] overpayment because of reliance on erroneous information from an official source within the [SSA] . . . . with respect to the interpretation of a pertinent provision of the Social Security Act or regulations pertaining thereto, . . . such individual, in accepting such overpayment, will be deemed to be without fault." In such instances, "adjustment or recovery will be waived

---

[11] Plaintiff testified she has since contacted the FERS benefits administrator to attempt to recoup the past deductions, but she did not get a response. AR 33-34.

since . . . . such adjustment or recovery is against equity and good conscience." 20 C.F.R. § 404.512(a); see also Nickerson v. Andrew, Civil Action No. 19-cv-01219-MEH, 2020 WL 3063900, at *8 (D. Colo. June 9, 2020) (finding that § 404.512(a) requires recovery to be waived without regard to equity and good conscience or whether recovery would defeat the purpose of Title II).

Plaintiff argues she is without fault under § 404.510a because the underpayment notices she received "specifically referenced a review of Plaintiff's earnings records and [stated] that a determination had been made that certain earnings were not included when the [SSA] determined Plaintiff's benefit amount." Mot. at 8. Plaintiff argued to the ALJ that she was "affirmatively being told that the payments were accurate based on [her] earnings." AR 189. The ALJ rejected this argument because the underpayment notices "did not reference any specific federal regulation or policy interpretation when stating that the [SSA] had increased claimant's payments" and thus "do not constitute an interpretation of any [of] the [SSA's] specific regulations made by an official source within the [SSA.]"[12] AR at 15.

The Ninth Circuit has not specifically addressed whether notices comparable to the underpayment notices received by Plaintiff are sufficient to find she was without fault under § 404.510a.[13] In her decision, the ALJ applied Valley v. Comm'r of Soc. Sec., 427

---

[12] The ALJ also rejected Plaintiff's argument that she never received an official or proper notice of the overpayment under 20 C.F.R. § 404.502a and 20 C.F.R. § 404.506(b). AR 16. The ALJ reasoned, "to the extent that any improper noticing implicates due process issues, the claimant had ample opportunity to plead her case" and "any due process issues in the initial noticing of the overpayment would constitute a harmless error." Id. In her Motion for Summary Judgment, however, Plaintiff does not challenge this portion of the ALJ's decision.

[13] The Ninth Circuit has noted broadly that § 404.510a "provides that a person who accepts an overpayment in reliance on erroneous information from SSA is deemed without fault." Anderson v. Sullivan, 914 F.2d 1121, 1123 (9th Cir. 1990). The court also suggested that without an explicit finding that the SSA misled the claimant, the ALJ need not even

F.3d 388, 393 (6th Cir. 2005), in which the Sixth Circuit found that annual letters from the SSA "describing [a claimant's] current benefits and informing him of his benefit increase" do not constitute an official interpretation of a pertinent provision of the Social Security Act or regulations thereunder so as to deem a claimant "without fault" for accepting overpayments. The court reasoned:

> Although the letters necessarily imply some interpretation of the Act and its regulations because they outline [the beneficiary's] entitlement to benefits and a benefits increase, they do not purport to make any explicit or specific interpretation. Rather, the letters appear to be supplements to the benefit checks that notify the recipient of the amount of benefits awarded. If these documents – obviously form letters – constituted official interpretation of the statute or regulations sufficient to trigger the good conscience exception to repayment, virtually every Social Security benefit recipient would be entitled to waiver of repayment assuming they received benefits of any kind and a letter describing those benefits.

Id. at 393.[14]

Since Valley, multiple district courts have found that form letters sent by the SSA to overpaid beneficiaries regarding their benefits, including increases to their benefits, do not constitute erroneous interpretations of SSA regulations under § 404.510a. See Stone v. Berryhill, Case No. 17-cv-1952 (CRC), 2019 WL 1440130, at *1 (D.D.C. Apr. 1, 2019)

---

consider § 404.510a. Id. at n.3. The court did not, however, discuss the types of erroneous information or misleading statements that implicate § 404.510a.

[14] The ALJ also cited Rodysill v. Colvin, 745 F.3d 947, 953 (8th Cir. 2014), in which the court relied on the Sixth Circuit's reasoning in Valley to hold that the "mere receipt of disability benefits after notifying the Commissioner of [a beneficiary's] work activity does not satisfy § 404.510a." The ALJ also distinguished Valente v. Sec'y of Health & Hum. Servs., 733 F.2d 1037, 1045 (2d Cir. 1984), in which the beneficiary gave specific testimony that she repeatedly spoke with SSA employees who told her she was entitled to keep the payment. See also Gladden v. Callahan, 139 F.3d 1219 (8th Cir.1998) (finding waiver of recovery appropriate where the claimant relied upon the statement of an ALJ in accepting the overpayment).

(finding that two annual notices "informing [the claimant] of retroactive increases in her monthly benefits" do not qualify as "official interpretation[s]"); Bocks v. Comm'r of Soc. Sec., Case No. 1:17-cv-988, 2019 WL 1416866, at *6 (W.D. Mich. Mar. 29, 2019) (applying Valley and finding that "[t]o obtain a waiver of repayment on the basis of 'misinformation,' a claimant 'is only misinformed when she actively sought information which subsequently proved to be incorrect'") (citation omitted); Feenster v. Colvin, 220 F. Supp. 3d 123, 128 (D.D.C. 2016) (finding reliance on erroneous information of eligibility in a "Noticed of Proposed Decision" does not render claimant without fault); Glosemeyer v. Colvin, No. 1:14-CV-414, 2015 WL 5943664, at *5 n.3 (M.D.N.C. Oct. 13, 2015) ("Supplemental letters outlining a claimant's entitlement to benefits and a benefit increase which make no explicit or specific interpretation of a pertinent provision of the Act do not constitute information from an official source within the SSA."); report and recommendation adopted, No. 1:14-CV-414, 2016 WL 843308 (M.D.N.C. Mar. 1, 2016); see also Carsley v. Comm'r of Soc. Sec., No. 12-1102, 2017 WL 2610520, at *5 (W.D. Tenn. June 16, 2017) (affirming finding of fault in light of letters referencing the amounts claimant could earn on a monthly basis and where the claimant did not make any effort to question the calculation or inconsistency with prior information); but see Hassett v. Comm'r of Soc. Sec., No. 1:12cv419, 2013 WL 3834372, at *7 (W.D. Mich. July 24, 2013) (remanding case where the SSA did not send notices of earnings limitations, and instead sent two letters advising plaintiff that the SSA had recalculated his benefits based upon his earnings that he was entitled to an increased amount); Stolztfus v. Astrue, Civil Action No. 11-6056, 2013 WL 1842237, at *6 (E.D. Pa. May 1, 2013) (waiving repayment where the claimant reported all work activity and where his eligibility for benefits would not have been disturbed if his employer had not erroneously withheld some of his wages and then retroactively paid them to the plaintiff).

   In many of these cases, however, the claimant admitted they knew they were not entitled to continued benefits. In Stone v. Berryhill, Case No. 17-cv-1952 (CRC), 2019 WL 1440130, at *1 (D.D.C. Apr. 1, 2019), for example, the district court agreed the claimant

was not without fault even though she "met with agency representatives three times over the course of three years to disclose her earnings, express confusion, and ask that the payments stop." Like Plaintiff, the claimant in Stone received two annual notices "informing her of retroactive increases in her monthly benefits." Id. The district court also relied on the fact that the claimant "acknowledged at her hearing that she knew of the income limits when she applied for the benefits, that she exceeded those limits when she returned to work, and that she suspected something was amiss when she received the monthly checks thereafter." Id.; see also Brown v. Berryhill, 15-cv-8201 (VSB) (BCM), 2017 WL 2493275, at *8 (S.D.N.Y. Mar. 3, 2017) (claimant never argued that he believed he was entitled to payment and admitted he "expected the checks to stop"), report and recommendation adopted, 15-cv-8201 (VSB) (BCM), 2017 WL 2484204 (S.D.N.Y. June 8, 2017).

Here, it is not entirely clear the "form letters" sent to the beneficiary in Valley informing him of his annual increase are comparable to the underpayment notices sent to Plaintiff. Moreover, Plaintiff cited specific language in the underpayment notices upon which she purportedly relied in continuing to accept payments after her return to work, and the ALJ did not address that specific language in her written decision. Also, as discussed above, the ALJ did not address whether Plaintiff, prior to returning to work, was specifically aware of the earnings thresholds that, if met, would adversely affect her SSA benefits.

As was the case in Valley, however, the underpayment notices upon which Plaintiff relies merely "outline [Plaintiff's] entitlement to benefits and a benefits increase" and "do not purport to make any explicit or specific interpretation." See 427 F.3d at 393. While reasonable minds might disagree as to the persuasiveness of the reasoning in Valley, it cannot be said the ALJ committed legal error in applying it here. It also cannot be said the ALJ's reliance on a lack of reference to any specific federal regulation or policy interpretation constitutes a lack of substantial evidence or a misapplication of Valley or

19cv1024-LL

some controlling authority. AR at 15. Accordingly, the ALJ did not err in finding Plaintiff was not entitled to a waiver of the overpayment under § 404.510a.

## IV.   **CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Summary Judgment [ECF No. 26] is **GRANTED IN PART** and **DENIED IN PART**. With respect to Plaintiff's argument the ALJ did not sufficiently consider whether, under 20 C.F.R. §§ 404.507, Plaintiff knew or had reason to know her SSA benefits were supposed to stop in December 2012, the Motion is **GRANTED**. With respect to Plaintiff's argument the ALJ should have found her to be without fault under 20 C.F.R. § 404.510a based on the erroneous information in the underpayment notices, the Motion is **DENIED**.

The law is well established that the decision whether to remand for further proceedings or simply award benefits is within the discretion of the district court. McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989); see also Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981). Remand is warranted where additional proceedings could remedy defects in the decision. See, e.g., Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir. 1984); Lewin, 654 F.2d at 635. Remand for the payment of benefits is appropriate where no useful purpose would be served by further administrative proceedings, Kornock v. Harris, 648 F.2d 525, 527 (9th Cir. 1980), where the record has been fully developed, Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986), or where remand would unnecessarily delay the receipt of benefits for which the disabled plaintiff is entitled, Bilby v. Schweiker, 762 F.2d 716, 710 (9th Cir. 1985).

Here, the record has not been fully developed as to whether Plaintiff knew or should have known her SSA benefits were supposed to stop in December 2012. It is therefore not clear that Plaintiff is entitled to a refund of the money the SSA has already deducted, and is currently deducting, from her current SSA benefits based on the previous overpayment. This is not harmless error because, had the ALJ fully developed the record on this issue, the outcome might be different. This matter is therefore **REMANDED** for further

19cv1024-LL

1 proceedings to address the errors identified herein. The Clerk of the Court is directed to

2 close the case.

3     **IT IS SO ORDERED**.

4 Dated:  October 7, 2021

_____

Honorable Linda Lopez

United States Magistrate Judge

19cv1024-LL